Mark Vanderhout, appearing on behalf of the petitioner in the case. Your Honor, along with Megan Bersenfeld from office and Michael Tanaka, the Federal Public Defender, appointed on the case. I'd first like to thank the Court for accommodating the conflict in my schedule on Monday, and I appreciate the Court rescheduling this for me. And thank you for coming to Pasadena. My pleasure. What I'd like to do before addressing what I think is the main issue that needs addressing here today is just briefly address the government's argument regarding the fugitive disentitlement doctrine that was raised in their supplemental reply. You've had no chance to respond to that because it was never really raised until the reply to the supplemental brief. Correct, Your Honor. We have not had a chance to. That's why I want to spend a minute or two just addressing this, and if the Court wants supplemental briefing, we'd be happy to do that. And that's why I'm going to be citing a couple cases to the Court. We believe that the doctrine should not be applied here. First of all, it's a discretionary doctrine. What did you do about Kaczynski's case? Well — Isn't it directly involved? Four squares? No, Your Honor. He says you have disentitlement when you have a — when somebody absconds in an immigration case. Well — And that's this case. That — well, with all due respect, Your Honor, it's not really. And the reason that it's different there is that in that case, the issue was whether or not the person should be granted asylum. And Judge Kaczynski said, hey, look, we're not kind of a win-win situation. We rule for you, and you win, and we rule against you, and you win because you're gone. And the purpose of the fugitive disentitlement doctrine is to not reward that sort of activity at all. It's also to not make a mockery of the appellate practice, of the deficient appellate practice for the court. You're saying he was wrong? Pardon? You're saying he was wrong? No, I actually don't think it was wrong in that case. But the reason is, is that it's not to reward — you shouldn't reward Petitioner, and you should save judicial resources. Because it's a discretionary action, and Antonio Martinez actually says it is, that it's up to the Court's discretion whether to do that or not. And United States v. Gonzales, this Court's decision in the prior year, that's at 300 F. 3rd, 1048. Both say it's discretionary, and the Court should take into consideration those three factors. In our case, we think none of the factors expressed in that doctrine would be served by dismissing the case under that doctrine. The reason is, is that Mr. Armentaro, first of all, is not going to gain anything from the Court deciding the main issue in this case, which is regressive briefing on. That is, who is the proper custodian for immigration cases. No matter what happens, the Court is going to remand the case back to the district court for determination of — it consists with the decision of the naming of the respondent in the — Counsel, Judge Maskell calling on the phone. Can you hear me? Yes. I'm just maybe a page or two behind on this case, because I have not seen anything yet that was a concession that he has absconded. Has he absconded? Your Honor, in our filing, when we asked the case be held in abeyance, we said we need time to investigate. And I'll tell you what we've done. Mr. Tanaka was his attorney in the Federal Public Defender's context. He has not been able to find — have contact with him. We don't have a reason to doubt what the government asserts. That is, we don't have any basis, let me put it that way. When he's paroled, doesn't he have to keep the authorities advised of his residence, his whereabouts? I'm assuming he does, Your Honor, and I'm assuming what the government submitted as attachments are true for the sake of this argument. All right. I just wanted to establish it as a factor whether we're talking about a theoretical proposition. We're not able to confirm whether it's true. We just have not been able to call him. With the phone numbers that Mr. Tanaka had and the attempts he made, he was not able to find him. The court can take — When was he released? Well, the government provided that information in its filings, and he went to the halfway house. I don't have the exact dates in front of me, but — and he was in the halfway house for a while, and then the halfway house lost contact with him. He left the halfway house. Do we have some dates? We're talking about a week, a month? No. No, it's several months at least. Okay. And I can find those dates. I don't have those in front of me. We have nothing further than what the government submitted to confirm that. But what I'd say about that is that we don't believe that the doctrine should be applied here, even if you assume that he has — Before we get to that, just let me ask one more question, and then you can go through with what you want to say about that issue. How long should the court wait? How long should we wait before we assume that he's presumed gone? Well, what I think should happen in this case is that because the Court has devoted such — so many resources to this case and this issue already, and has asked the parties to brief this extensively over the last couple of years, and because it's such an important issue to the other Petitioners and to the bar that needs to represent individuals, we think it's extremely important for the Court to reach this issue and give guidance. Mr. Armantaro, his situation can be dealt with back in the district court. Once he's back in district court, at that point in time, he's going to have to amend the complaint. He's done — You're saying at this point we're not going to grant him any relief anyway, or we're going to decide as soon as the proper Respondent and send it back to the district court for an amendment, and at that point you can deal with any fugitive status problem. Absolutely. That's correct, Your Honor.  There's nothing he gains by a court decision. He gets — either way, he gets sent back to district court, and the district court at that point can deal with and decide whether to — And the resources question sort of cuts in the opposite direction in this case, because we've already spent a great deal of time on it. A tremendous — a tremendous amount of time, and that's why I think the Court should reach it. And I'd like to send a couple cases to the Court where that has occurred. In the recent Cazares-Gutierrez decision, the Ninth Circuit reached on August the 24th of this year, the issue in that case was whether the case should be dismissed for lack of jurisdiction. And there were two grounds of jurisdiction, aggravated felony and a controlled substance offense. And the government argued that that case should be dismissed and the Court shouldn't reach the issue of whether or not that drug offense was an aggravated felony. And the panel in that case said, no, we should reach it. There's been substantial briefing. It's an important issue. It's an issue that is — that needs attention in this circuit. And, yes, we could avoid it. We could just dismiss lack of jurisdiction because of this other ground. But it's important for us to set the record straight of what we believe is and is not an aggravated felony and give guidance. And that's what's very important. In this — in the panel in this case, in footnotes 7 and 8 of its original decision, I spoke at length about why it was important to give guidance to — to the Petitioners and — and Practitioners regarding — Kagan. So can I suggest that we get to somewhere closer to the merits because we're going to run out of time sometimes? I'm just responding to the questions you asked. One other case, Escobar-Ruiz, 838 F. 2nd, 244. It's a 1988 case that I was actually involved in there. The issue was whether the Equal Act or the Justice Act applies or not. The Court decided that my client was not the prevailing party in that case. And then there was a discussion of, well, should we even decide the issue of whether or not EJIA applies in immigration cases? And the Court went on over a dissent and said, yes, we should decide that because it's such an important issue. We're on rehearing. I'm bonked. There's been supplemental briefing. It's an important issue, and we should reach that issue. So I would encourage the Court to — to reach the issue in this case and — and let Mr. Armenterro deal with that doctrine back in district court. As to mootness, very briefly, the parties are in agreement that the case — case is not moot. Obviously, if he's found again, he'll be likely put back in — in custody, that is, in — in confinement, and — and the issue will be right to his case immediately. As to other potential Petitioners, this is an issue that would be capable of repetition, yet avoiding review because — Yeah, but see, we don't have class action suits in — in immigration cases. I'm not talking about a class action suit, Your Honor. But it is important — You said other Petitioners, you said. That's a class action. Well, what this panel did — K-4 repetition usually applies to the particular Petitioner, not to somebody else, so. That's correct, but the law that will be established by this is very important, as the Court noted in — in footnotes 7 and 8 in its prior decision, as Justice Barberi's Court noted, that even though one individual is at stake in Gazarus, all these cases where law is established, all these applies across the field. If it's moot or moot, it wouldn't matter, but since you both agree it isn't moot, let's move on from there.  Okay. Now, as to the merits, the main issue, of course, is — is who is the proper respondent in an immigration habeas case. And we believe that both the decisions of Padilla and Mazul at the Supreme Court support this panel's decision. Padilla holds that in habeas cases that are not core challenges to present physical confinement, that the immediate custody custodian rule does not apply. That's what Padilla — the Supreme Court held in Padilla. Immigration cases are not — are not core challenges to present physical confinement. But isn't the real problem that there are different kinds of immigration cases? And, you know, I actually took a look at the footnote in Padilla which cited a whole bunch of immigration cases, including this one. And everyone but this one was a case in which, although the person was in detention, the challenge was to the removal in some fashion or another. But this one's not of that ilk. And so the question is, what about this case? Well, I'd like — I'd like to address both aspects, Your Honor, but I will address obviously this case. In this case, we believe that the issue — Your Honor's right. The vast majority of habeas cases, especially since the change of law under IHRA-IHRA in 1996, which directed based on the Supreme Court's decision in St. Cyr, that final orders of deportation be challenged by way of habeas, has increased many-fold the number of habeas petitions. And that's why this issue is really so important and coming before the courts so often. Many of the challenges to final orders are not even people who are ever detained. So you're going to get habeas cases. I say the vast majority. I don't have statistics, but my practice and my colleagues, the vast majority of people have actually never, ever even been detained. And there's no particular logical reason why, for the purpose of challenging the removal order, the person who is detained or isn't detained ought to be treated any differently. Absolutely not. And that's what Padilla says. Padilla says you look at the nature of the — of the challenge, and if they're not detained. Again, it's not this case, and I want to get to this case. But who would be the proper Respondent in that case, in a case in which it was challenging the removal order? We believe the — Go back to our original Attorney General, head of a — of Homeland Security. Secretary of DHS and the Attorney General. The reason is, is that those individuals are the ones that really control the decision in this case. If you — and I think it's shown by the — Well, in those cases, but then we've got to consider this case, all right? Excuse me. Those cases with challenging final orders. That is correct. And the reason is, is that the — the local — first of all, the briefing, I think, has clearly shown, and the cases that have discussed it have clearly shown that with immigration detention, you have people in contract facilities that are privately run. You have people in local jails. You have people in county jails. You have people all over. And there's no way that those immediate, quote, unquote, custodians, have any control over the issue. But more than that, as you started to say, whether they're in detention or not in detention is sort of to the side of the question of whether their removal is proper or not proper. And they can be let out of detention, as many people as you say are, and that's still not going to resolve whether they're going to be removed or not. So the question — so dealing with the custodian is simply not relevant, because the custodian can let the guy out of whatever jail he's in, and it's still not going to solve the question of whether he's deported or isn't deported. That's correct, Your Honor. And as a matter of fact, some of the people have never been in jail, as I said, at all. They just have to, because of — they have certain convictions, have to go by way of habeas to the district court. And they've never been in custody whatsoever. So what about this case? This case is about detention. It's not about — the removal order is not being challenged. What's being challenged is the authority to hold him, detain him until the removal order is executed. That's what's being challenged. That's correct, Your Honor. Even in this case, even in this situation, we believe that the language of Padilla would control this, and because it's not a core challenge to the — That's what I'm having some trouble with. Okay. And let me try to enunciate that in what I believe the issues the Court should look at. Mr. Armentaro was challenging the issue of how long the government could keep him in detention in order to effectuate the deportation order. All these challenges are based ultimately on the deportation order itself, and there's an attendant consequence to that deportation order. So when Mr. Armentaro challenged this and saying, hey, you want to deport me, okay, deport me, but don't keep me in jail, either deport me. That sounds an awful lot like a core case. Well — Because — exactly because he isn't challenging the removal order. He's saying, remove me if you want to remove me, but don't keep me in jail. So the question is, can you keep him in jail? But it's a consequence of the — of the removal order, and that's what we think it's — that's what's so important. It's not like he's challenging the conditions of his confinement. He's not objecting to — Well, he was doing that, too, originally, actually. Well — But that may be moved. But he was doing that originally. The issue which is — the core issue which he was challenging, which is a needless issue, which is at the Supreme Court now, is does he have due process rights and can they detain him indefinitely? And, yes, it does deal with technically how long will he stay in jail. But the reason I think it's distinguishable is the ultimate legal challenge is to whether or not, because it is deportation, they can keep him in jail. And it goes back to the deportation error itself. And what the Supreme Court said in Padilla is don't look at detained, non-detained. That's not really the issue here. Look at what the legal challenge is. What is this legal challenge to? And it's solely about the present physical confinement or the conditions of confinement. Then the immediate custodian rule might apply. But if it's not to that, and we believe even in Mr. Armatero's case, and we can see that's a harder issue. We think the challenges to the final order are very clear, whether or not the person is detained or not detained, because all they're challenging is the final order. Which is most of the cases. Pardon? That's most of the cases. Well, that covers most of the cases. That's most of the cases, absolutely. And that's why we believe it's so important for the Court to reach the issue here and give guidance to everybody about that. And that's the vast majority of cases. Yes, there are people who are challenging how long the government can keep them under Zadvaitis or we're doing that, and now under the Benitez case that will be decided by the Supreme Court. But as to the underlying challenge, it's still attendant here to the deportation  So we think that's Let me ask you a more technical problem. The government's argument is that the, although they're never quite clear about who the respondent should be. It should be maybe the media custodian or maybe the regional director. Is there anything about the Mariel Cuban cases in particular? I was looking at the government supplemental brief, and I noticed that every order that was issued with regard to Mr. Armenterio was actually issued by somebody from the Cuban Review Board in Washington. And not by the regional director. Is that generally the case? Is there a different way that these cases are handled than ordinary detentions, for example? Well, those cases are reviewed in Washington. It's absolutely true. And so that would give even more indication that it's not controlled by the local custodian. But even in a non-Mariel Cuban case, that review is not taken by the custodian. That's definite. It's not taken by the warden of the facility. It's not taken by the contract individual or the local jailer. It's taken by high-up officials in the immigration. But they say it's by the regional. They say the regional director has the authority to do all of that in the usual case. And I'm asking, A, is that true? And, B, are the Mariel Cuban cases different in that regard? Mariel Cuban cases do need a review higher up. That is true. And the regional directors can. I don't think they're still called regional directors. The higher-ups in the offices can. But an important point, and then I'd like to stop and take a couple of minutes for a rebuttal. The important point there is that in those situations, you still wouldn't know who to sue, even under the government's theory. These field office directors, well, there's only 34 of those throughout the country. There's 90 or 33 of them, I think it is. And there's 94 judicial districts. As we pointed out in our briefs, you'd have situations where you'd be suing in one place where the individual is confined, perhaps, but the field office director would be an entirely different judicial district, sometimes in a different state, as we pointed out in the Ballesteros case that we cited there, where the government realigned, aligned really, and now the person's subject to somebody in control in Denver, yet he was sued in Idaho, and the government's saying, well, let's move him now to Denver and have it decided under the Tenth Circuit law and the Ninth Circuit law. And that's why we think that is really unworkable, even in this situation, Your Honor. When the immigration law judge committed the petitioner to custody, what was the order naming the custodian? It wouldn't have done that, Your Honor, because the ‑‑ Well, let me go a little farther. Okay. Do you know who the custodian is in criminal cases in Federal court? The district court judges sentence a defendant to 10 years. Who is the custodian in the original order? Well, I'm not saying I'm positive. Bureau of Prisons. Yes, Your Honor, but that's not ‑‑ He committed to the Bureau of Prisons as a custodian. That's not correct. That answer, it's not the case, though, in the immigration context. Well, I know that. I asked you, and I wanted the framework of criminal cases. Now you tell me about the immigration case. In the immigration context, Your Honor, there's an order by an immigration judge. What does his order say? His order says you are to be deported. And it is the ‑‑ ultimately, the attorney general carries out that deportation order. And the detention is to the ‑‑ the immigration judge does not order detention. That's an administrative executive ‑‑ So the immigration judge does not order detention. Correct. Who orders detention? If there is detention, it's in the first instance by a local immigration official. That can be reviewed, then, by an immigration judge, reviewed by the Board of Immigration Appeals, and ultimately the attorney general. So, again, you have the attorney general. But is that true in the Mario Cuban cases? I thought in the Mario Cuban cases, and I don't really know it very well, but from what I can understand, the direction is coming in a different direction, that each of them is subject to this protocol before this Cuban review board, and the local officials are not making decisions. The decisions are being made by the review board. Is that right or not? That is true, Your Honor. I was answering to Ferguson's question, which I thought was in general in immigration cases, who's calling the shots. So that's what I was answering there. In general immigration cases, ultimately the attorney general is the one who decides whether or not to do it. Isn't there something wrong when bureaucrats can sentence somebody to prison? That's the case that's in the Supreme Court. If there's a judicial review, we think that's... They can do it before they enter the country, but not when they enter the country. Has that question ever been raised, the constitutionality of bureaucrats sending people to prison? The individual does have the right to review ultimately and can get out of the administrative, as you say, bureaucrat process ultimately, but it's got to go through three levels. The immigration service makes the determination. A person can ask an immigration judge to renew that. That can get appealed to the Board of Immigration Appeals. Then the attorney general can make the final decision on that.  It bothers me a lot, Your Honor. We're in district court when we can, ultimately challenging that, and I've been to district court on several occasions challenging that. You do have to exhaust, and so you have a situation, yes, where unfortunately you've got low-level bureaucrats, as Your Honor stated, making decisions on departments. But at some level that's the issue that's on the merits of the Supreme Court here, which is can these people be kept in custody under this administrative system? Correct. And the first issue is do they have any right to go to court to challenge it in the first place. That's the due process issue there. That's up on the merits of the Supreme Court, which ultimately will control the merits. All right. We'll give you some time in rebuttal. Thank you very much. I appreciate that. May it please the Court, Michelle Gordon for the government. The Court should dismiss the appeal in this case. When Mr. Armentero filed his habeas petition, he challenged his continued detention. Instead of awaiting a decision by the Court, he chose to leave his half-time job. And you didn't raise this issue at any point while the case was pending, when he left, when he disappeared, when we asked for supplemental briefs, until the reply brief. And ordinarily, we don't address issues that aren't raised until the reply brief. And this is a discretionary doctrine. So why should we be addressing it now? It is a discretionary doctrine, Your Honor. The facts supporting the fugitive disentitlement theory, though, were in the supplemental brief. Yes, but the theory wasn't. The argument wasn't. And we don't know. And you argued, and you said specifically that the case wasn't moved. We did. So your opponent really had no opportunity to address the question. Well, I think we were taking up our time on argument on it now because it wasn't addressed in the briefs properly. Well, Your Honor, I think that there was an opportunity for them to address it just in the reply because the facts supporting the argument were there. And also, if you take into account the consideration of the chronology of events here, Mr. Armenterro was released to the halfway house on August 7th of 2003. He left his halfway house placement without permission shortly before the Court issued its first ruling, its published ruling in this case. So the facts with respect to fugitive disentitlement were even present even before the Court issued its ruling. All the more reason. You should have told us that. All the more reason. I think that either side could have known or had reason to know and could have let the Court know about it, Your Honor. I also think that there's really no prejudice here because, again, the facts underlying that fugitive disentitlement doctrine were submitted to the Court in the first When did you first learn that he had absconded? Your Honor, we didn't learn about this until we were preparing to submit supplemental briefing in the case. That's when we learned about the facts. And the facts were being viewed in consideration of the Court's order to direct us to address whether or not the case was actually moot. And you didn't feel then that you should raise the issue? I think that we were still in the process of viewing what the legal ramifications for the case were. And the view was a very narrow one at that time in terms of determining just whether or not the case was moot in an effort to answer the panel's question. Okay. Secondly, if we were to get to the merits of this, what about Mr. Vanderhoef's observation that, in fact, the policies underlying the doctrine might not apply here, First of all, because all we're doing here right now is dealing with the technical question of who the proper Respondent is. We then send it back to the district court and you, if we send it back to the district court, and you then deal with your fugitive argument at that point. Okay. Well, I think that the issue of the proper Respondent is one that's exceptionally important to both sides of the matter. I think that the Court's ruling, original ruling that the Attorney General or the Secretary of DHS are the proper Respondents in these cases is a favorable one to aliens like Mr. Armentaro because, in their view, it allows them to file their habeas petitions anywhere throughout the nation. Well, that's, of course, not true. They can only file it wherever there's venue, and there's only going to be venue in a few places. Well, under the Court's ruling in Rasul, actually, if they're the — if the Attorney General or Secretary of Homeland Security are the named Respondents, they can only file in the District of Columbia. Where do you see that in Rasul? I didn't see that in Rasul. I saw that in — in Rasul, you had a case in which the — there was no other place because everything happened outside the district, and moreover, the statement was that everybody agreed that that was the proper Defendant. So there was no — where was the ruling in Rasul about that? Well, I think it was — it was tied into the fact that habeas petitions or the writ can only be issued — well, that the — that the Respondent has to — that the habeas petition has to be directed to the person who has custody, and that in that case, the only person that they could identify because the individuals were outside of the United States are the Attorney General and the Secretary and were the Attorney — excuse me, whoever the Respondent was in that particular case, and that the venue was proper in the District of Columbia. Right. But they didn't say the venue wasn't proper in some other case somewhere else. And I think that the understanding in Rasul, though, is that because those individuals could properly be found in the District of Columbia, that that's the only — But ordinarily, I mean, the Attorney General is sued every day here in California in a case with proper venue in California. But I think that venue concerns take this away from what is at issue here, and that gets us back to the Supreme Court's ruling in Padilla. And if we're going to get to the proper Respondent issue, then the ruling in Padilla says that in core challenge cases such as this one, where the alien makes a straightforward challenge to his custody and nothing else, then the proper Respondent is in immediate custody, and that's the warden or the warden-like official where he's housed. Okay. Now, there are at least three different varieties of immigration cases. One of them, there's cases where the person's not in custody at all. There are cases where the person is in custody, but the challenge is not to the custody as such. It's to the removal order. And as I said, every case in the footnote in Padilla except this one was of that variety. And then there's a case like this one in which arguably, and this is what I'd like to discuss, the challenge is to the custody. Is your position that the same rule applies in all of these cases, or are you arguing only with respect to this kind of a case? Our position is that Padilla applies to immigration cases. But with respect to this particular case, and that's all we're arguing. So in other words, you would argue that even with respect to somebody who is in custody but the issue isn't the custody, that the Respondent has to be the local warden. Who could be a local jailer or a private person or whatever. Well, Your Honor, the Department of Homeland Security and the Department of Justice are undertaking a study of these particular issues with respect to removal cases and detention cases with a view toward developing a position possibly put forth in regulation. I don't understand how the Department of Homeland Security can write a regulation about who a proper Respondent is in a Federal case. Well, I'm not sure that the regulations wouldn't be directed to that. They would only be directed to letting an alien know who the person is with administrative and legal control over your particular case if you're challenging a particular form of custody. So it would be in the interest of the alien and in terms of providing guidance to let them know who is the person with administrative control over your case and legal control over your case. And that certainly is within the Attorney General's and the Secretary's authority under the statute and the regulations. With respect to this case, Mr. Armenterra was in a San Pedro processing facility when he filed his habeas petition. So the official on site at that processing facility would be the proper Respondent in this particular case under the rule of vizia. The rule is that he's not there. He wasn't there at the time the case was litigated. He's been in four different places since then. But he was there. And where he is at any particular time, as I understand it, is being controlled by whom? Who's deciding that? I'm not sure that I understand the question. Who is the person who decides where he was in custody at the various times he was in custody? Well, with respect to his transfers, the person who was in charge of that, I suppose, is the field office director. But that doesn't mean that he was transferred to different places in different field offices. Well, I think that the agency makes determinations according to where there's appropriate bed space. So what's the agency? That's what I'm trying to find out. Who is making the decisions? And also, if you could address my question about the Mayor of Cuban situation in particular and whether it's different. Well, I think that the agency, well, the agency meaning Immigration and Customs Enforcement and the field office director in those agencies make the appropriate determinations as to whether or not a transfer of a particular case is warranted. So if he's in San Pedro, right, the field office director in San Pedro decides to send him to Indiana? Or I forget where else he went, but let's say I suppose it was Indiana. If I'm not mistaken, I think that that is the individual who has the authority to make those determinations about the transfer. All right. Then once he's in Indiana, who decides to send him to Colorado? I'm not entirely sure about that, Your Honor. But with respect to these different transfers, Your Honor, that doesn't – what the Supreme Court made clear in assessing X part endo or in discussing X part endo is that when an individual files a habeas petition, if it is properly filed, if he names the right So that habeas jurisdiction still lies in the district where he originally filed the habeas petition. Well, I understand that, but does it – and I understand that. The cases do say that. It seems very strange to me if we're concerned with the question of who can actually produce this person, when we know that the person who is the respondent that you're asking for, the custodian in San Pedro, is the one person who we know can produce this person. Absolutely not. No way. Well, at the time that he filed his habeas petition, yes. I know at the time he filed his habeas petition, but what about now? There's no way. Well, now there's no way because we don't know. I know, but even if he were still where he was supposed to be, it would be no way. Well, I'm not sure. I mean, well, the Supreme Court stated it, and even when it analyzed its decision, it said that the transfer can't defeat habeas jurisdiction so that the writ can be directed to an appropriate official who is within the district where the habeas was case would be the warden or the warden-like official who was in charge of his custody at the time that he filed. With respect to the fact that decisions in Muriel Cuban cases are made by a Cuban review panel, that also does not mean that this case should be taken outside of the context of Padilla. In Padilla, the court addressed the petitioner's challenge that the case was indeed unique for a number of different reasons, but that doesn't mean that the case is not taken from being outside or is taken outside of being just a court challenge, a court traditional habeas challenge to detention, which is exactly what this is. But in your brief, as I understand it, you're now saying that the proper respondent was the custodian of San Pedro facility. Your brief didn't – I did not understand your brief to take that position. I understood your brief to say that we didn't need to decide and you weren't taking a position on whether the proper respondent was the field office director or the custodian of the particular facility because it didn't matter. Isn't that what you said? Well, the court could issue a ruling like that because he did file properly in the district of confinement here. So no matter who the custodian is in this case, he still filed his habeas petition properly. But your position now, which is different than the position you took on the first go-around, your ultimate position is that it's not the field office director, which is what you told us before, and in 2003 proceedings, but it's the – it's the custodian of the particular facility? Well, in the supplemental briefing, the point was to let the court know that the agencies, DOJ and DHS, are undertaking a review of the matter. We are taking this position here today to say that the warden or warden-like official at San Pedro is the proper respondent, subject to – possibly subject to revision by the agency after further study and review. But that wasn't – but I'm right in saying that that was not the position you took in 2003. I think that we did – it was the position – we did say that if the court wanted to reach a ruling in this case, and we said this in our first round of supplemental – I think in the July supplemental briefing, that if the court wanted to reach the issue in the case, it could – the government would object to finding the warden or warden-like official at the San Pedro facility as being the proper respondent here. Let me ask an issue that's in the newspapers. When Martha Stewart is released from prison after five months, she's going to be placed in home detention. Who's her custodian? If she wanted to file a habeas petition, I think her custodian would be the warden at the place where she was detained. Well, he's not her immediate custodian. She does not have an immediate custodian. But I think that the – I think the analog or the analogy there would be a transfer case where a person moves from a more restrictive setting to a less restrictive setting. Who in that instance would be the proper respondent? And I think that that's answered, again, by Padilla's analysis of ex parte endo in terms of saying that it is the person – the proper respondent is the individual who held the case. I think what Judge Ferguson is asking is, suppose she filed in the first instance while she was on parole? See, are you saying that in those cases in which there is no immediate custodian, that it's proper to have the legal custodian as respondent? Well, I – well, first of all, I want to – the petition that was filed here was filed when he was in custody in San Pedro. So that's the question that the Court has before it. He didn't file the petition when he was sitting in the halfway house. So the Court doesn't have to address what is perhaps a more difficult question. Well, I can see somebody in a halfway house. There's a caretaker there. Now, I don't know whether or not a carekeeper is a custodian or not, but, you know, we've gone beyond that in this case and in most cases. Well, I – Let me ask you another question. Suppose you have a sick daughter and you put her in the hospital. Who is her custodian? I want to say I'm her custodian, actually, but, I mean – Well, you're still the custodian, aren't you? Yeah, that's what I'm saying. And the hospital isn't. Now, why isn't the hospital? They have the body and they can deliver the body. Well, I suppose – well, I suppose that under those circumstances, I'm the person who makes all of the requisite decisions. And that is really – that's why this set of law is so peculiar, because we know that the custodian, San Pedro, couldn't possibly let this person out without clearances from – he has no authority. He's a placeholder. And the only person who could actually authorize – the people who could let this person out, we don't seem to have identified. It doesn't – probably not the regional – the field office director because of the Merrill-Cuban situation. Is that not right? Your Honor, those are the people who make the decisions about custody. And that's – those are the – those are the people who – Exactly. So, therefore, this guy's not getting out until they make a decision. But I think that the – I think that the question or the issue from Padilla is who can produce the body. But, of course, nobody – and this isn't your fault, but this is just that the law is so crazy because no one's going to produce the body. The person is not coming to court no matter what, right? Well, if the court directs it, then certainly somebody – Yes, but it doesn't happen. I mean, under modern doctrine, it doesn't happen. So, therefore, the only practical question is who can let this guy out of prison if we order him out. And it's not the custodian at San Pedro. But even if it – even if you get into the issue of contractual relationships, well – well, first of all, this doesn't even present the harder question of the contractual relationships of State or local governments because this was an INS. Right. I understand that. I understand that. So the INS did at that time have the authority to go ahead and release this particular individual. Right. And to produce the body within the meaning of that. The INS did. The INS is the respondent. You're claiming that's not the right respondent. It's somebody else. The INS does the – or the invent the INS. It's the individual within the agency, then. And who is it? I think in this case, Your Honor, it – the question is who is the proper respondent for habeas purposes. And in Padilla, what the Court said was that person, under the plain language of the statute and under past practice and under the way that the Supreme Court has interpreted the habeas statute, that person is the warden. It is the warden of the facility where the person is detained. And that even if cases may be unique, such as immigration cases are, you still have to get back to the fact of what it is that's being challenged. So is that – just to be clear, is that the government's position, then, that it's the warden of the facility where the person is detained, whether it's a private facility, a jail facility, a State facility, a Federal facility, that's the person? That is the person in this particular case, Your Honor. Again, the agencies are undertaking review. This position could be subject to change if the agency decides to issue regulations on the matter. But here today in this case – I'm having trouble with that. You're telling me that this is what Padilla says in plain language, and then you're telling me that the agency might decide something else. Well, only after reviewing – it's only after reviewing the contractual relationships and taking a view of who it is that has the administrative legal control in particular cases. But the important question is, here today, given that Mr. Romatero was in an INS facility at that time, who was the proper respondent? And in this case, that proper respondent is the officer on site at the San Pedro Pact processing facility. Let me ask you a slightly different question. Let me ask you another question. Assume – assume a – in a criminal case, a man has been sentenced to prison for five years, and then he's released. And then a year later, DNA evidence disclosed that he's innocent. What's his – what's his – he can't bring habeas corpus, or can he bring habeas corpus to get the judgment set aside? The answer is yes. The answer is yes, because he's not a criminal lawyer. The next question is, who's the custodian, right? Okay. So he can – he can get habeas. I guess that the immediate – I guess that the custodian in those cases would probably be the Bureau of Prisons. But I still think that since we're – that's not the case that we're talking about in this particular case. I understand, but we're talking about custody. And I'm trying to – I'm trying to discover what custody means. Well, I think that the Supreme Court has already done that for us. It's already told us that, you know, for the person who's challenging physical confinement, and that's the reason he was here, and that's what he challenged, because when he filed his petition, he was in custody. So the person who was in charge of his day-to-day custody is the person to whom the habeas – the writ should issue under the same – Unless the Attorney General decides otherwise. I mean, that's what I'm really having trouble with. But let me ask you a different question. Is it possible – well, I guess – I have two questions. One is I'd still like to know what you know about the Mariel Cuban government situation in particular. I mean, that is, how are decisions made under the Cuban review plan, and by whom? As far as I know, the alien gets a review every year. He gets a review or an interview by a three-person panel that is a panel that I think is from ICE, and then it is subject to review by the Associate Commissioner in Washington, D.C., if I'm not mistaken. But again, those are the people who make the decisions. They are not the people who are responsible ultimately for the release or the people with the day-to-day control like the habeas statute requires. But are they – I guess what I'm trying to pin down is that you – are they, rather than the regional directors or the field office service – office director, is that what they're called now – the people with the administrative authority to make decisions about these people? I mean, you had represented in your brief that the field officer directors were the people who decided whether to put people in custody and so on. But for these people, that isn't true. Is that right? Well, they're the people who – these people – they're the people who, after they've been placed into custody, they make the decisions as to whether or not they are authorized – they should be paroled into the community. Right. But again – But they don't make decisions whether to put them back into custody? That's what I'm trying to pin down. Oh. No. No. I mean, with respect to whether or not – I don't think so. With respect to whether or not their parole should be revoked, I think that those decisions are made after the individual has been arrested and then by the field office director, if I'm not mistaken. But if the Court wants further briefing on that, I'd be happy to provide it. Okay. It might be helpful just to know something about that, because it just struck me in reading your brief that there was a bit of a disconnect, because you were making representations about what the field office directors do, and then I read the papers that were attached, and everything seemed to be coming out of this review board, and that's what I was curious about, whether there was something different about this particular situation. I appreciate the point, Your Honor. But I just want to make one last point, that this case is just not about legal control, and the case is about who has immediate actual custody, because he was in custody when he filed. Once again, you know, you're saying that now, but your earlier briefs didn't say that, and you're not really taking that position firmly, because you seem to be saying that the Attorney General, by his designation of who the responsible authority is, could make it otherwise. It's a very difficult position that you're putting us in, because you keep changing your mind, you, not you, but you, the agency, about whether it's the regional director, the immediate custodian, or somebody else, except that it has to be whoever it is you want it to be. Except that the government just wants the opportunity to be able to review the cases and make revisions at a later time. But with respect to this case, it's very clear under the rule in Padilla that that is who the immediate custodian is in this case, and in cases like this one. Okay. I have one last question, and then I'd like to sit down. Is it possible to conceive of the challenge in this case as not being to his immediate  custody, in other words, to his Mario Cuban status, which allows him to be put in custody when the agency wants to put him in custody, so that, although he's now in — he was in custody at the time, suppose he was let out. Could he still have filed a habeas petition saying — and this is what the Rosales-Garcia case in the Sixth Circuit says, is the case isn't moved because he can be put back at any time. That's really what he's challenging, is the authority to put him back at any time, not the fact that he's in at the moment. Well, no, because when he filed, he was in custody. Right. Sure he was. I think that if — for whatever happens in the future, I mean, habeas is a snapshot in time, so that we're dealing with the circumstances as they existed when he was in custody. But if the case weren't moved even if he were let out, then the challenge isn't really to him being in. It's to do with the authority to put him in. Well, he wasn't let out, though. He was never released. I understand. He's the person who absconded from custody, but — and so that's what it is that makes this case not move. Of course, the agency does still have the authority at this point because he violated his parole to revoke his parole and to take him back into custody. But at that point, he would have to file — if he wanted to challenge that, he could file a new habeas petition. Okay. Thank you very much. I'll give you about two minutes. Okay. Let me try to be brief. As to the government request to allow time for it to come up with regulations, we don't believe it is appropriate. We don't believe it has the authority to decide the issue. Also, it's a statutory interpretation issue, so no deference would be given to the agency in any case. And also, given the government's track record, it would be at least three years before they came out with regulations, given their track record of this. They just came out on September 28th with regulations implementing the U.S. Supreme Court's decision in St. Cyr, despite the fact it was very, very crucial for people to know how the agency was going to be interpreting that decision. That's at 69 Federal Register 57826. On September 28th, 2004, they finally implemented the Supreme Court's decision in St. Cyr from June 2001. So we can't be waiting for the agency to do that, even if they have the authority, which we don't think they do. We think Padilla specifically decided that, specifically declined to decide, excuse me, the issue of immigration cases. And we've cited that to the Court in footnote 8, I believe it is. And importantly, Padilla does affirm Braden. And Braden was a case where there was custody. The individual was in custody. But because he wasn't challenging the custody, his custody, he was challenging an indictment in a different jurisdiction, the Supreme Court said, no, you don't have to file this in Alabama, even though that's your case. You don't have to name that local person, because that's not the issue here. The issue is something different than challenging a prison physical confinement. And we think that's very important, because in Padilla, it affirmed that concept. And even if an individual is in custody, like an immigration defendant or respondent who may be facing removal, if you're not challenging detention, but rather challenging something else, then you're challenging custody. Kagan. That's all well and good for the removal cases, but I'm having a hard, and I think a hard time seeing how it applies here. Gray was challenging his custody, his immediate custody. It's a lot clearer when all you're challenging the final order cases, and I think the Court could make a ruling as to those issues in delineating that. And there's two different categories there, detained and non-detained. But we think the same rule applies to those, because you're not challenging the custody. As to the facts of this case and the challenge here, we do say, Your Honor, that the Court, that the individual here, Mr. Armentaro, was challenging the conditions that resulted from his detention. That is, is the fact that the Attorney General could go and keep him in custody indefinitely, or even if they let him out, as the situation arose here, and the Court raised that as a question. He was out. He could have been out on, in the halfway house or out on parole at his home. He'd still have the possibility of being detained in the future at the whim of the agency. And so that is, he's not challenging his physical custody in that situation. He's challenging the ability of the government to have sanctioned him for his final deportation order. And we think that's a crucial distinction. Lastly, I would refer the Court to the Bell case, which we mentioned in our supplemental filing. The government said, well, we can represent the warden. Well, in that case, the warden had to submit a letter to the Second Circuit Court of Appeals saying the government refuses to represent me in this case. So I'm representing myself. And so there's a situation where the government has not done that. And lastly, we would refer to the form-shopping issue that we believe is a danger for the government. If you go with the immediate custodian rule, then they're saying they could choose to put the person anywhere in the country, and that's where the individual has to sue, even in that context. Thank you very much. Thank you both very much. The court is adjourned. Thank you very much.
judges: Meskill, Ferguson, Berzon